UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

J.V. PREYER individually and as the personal )
representative of the ESTATE OF )
JERRY PREYER, and on behalf of )
Jerry Preyer's SURVIVORS and the )
BENEFICIARIES of Jerry Preyer's ESTATE, )
)
Plaintiff, )
)
vs. )       Case No.: 3:08cv 247/MCRIMD
)
SHERIFF RON McNESBY, individually and in his )
official capacity for Escambia County, Escambia )
County Sheriff's Department and Escambia )
County Detention Center; CORPORAL RONALD )
HANKINSON individually; CAPTAIN )
BARBARA WERTZ, individually and in her )
official capacity for Escambia County Detention )
Center; LIEUTENANT DAVID PHILLIPS, )
individually; DEPUTY JOSEPH LAMAR )
BRAZWELL, JR., individually; CORPORAL )
JOHN COVOTTA, individually; )
DEPUTY SHAUN MICHAEL WHITE, )
individually; LPN MARGARET GRICE, )
individually; LYNN LAIRD, individually; )
DR. PIOTR SZMURLO, individually; )
NURSE CABOT WHITE, individually; )
RN MARY DAVIS, individually; )
NURSE TRUDY BURTON, individually; )
NURSE ELAINE GREGORY, individually; )
ESCAMBIA COUNTY, FLORIDA dba Escambia )
County Sheriff's Department and the Escambia )
County Detention Center; PRISON HEALTH )
SERVICES, INC.; and ARMOR )
CORRECTIONAL HEALTH SERVICES, INC., )
TASER INTERNATIONAL, INC. )
)
Defendants. )

CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
PENSACOLA, FLA.

08 JUN 13  PM 2: 09

KG

FILED

### PLAINTIFF'S COMPLAINT AND
### DEMAND FOR JURY TRIAL

PLAINTIFF J.V. PREYER (hereinafter referred to as "PLAINTIFF"), sues

DEFENDANTS: SHERIFF McNESBY, in his official capacity; CORPORAL RONALD

HANKINSON individually;  CAPTAIN BARBARA WERTZ, individually and in her

official capacity; LIEUTENANT DAVID PHILLIPS, individually; DEPUTY JOSEPH

LAMAR BRAZWELL, JR., individually; CORPORAL JOHN COVOTTA, individually;

DEPUTY SHAUN MICHAEL WHITE, individually; LPN MARGARET GRICE,

individually; LYNN LAIRD, individually; DR. PIOTR SZMURLO, individually; NURSE

CABOT WHITE, individually; RN MARY DAVIS, individually; RN TRUDY BURTON,

individually; RN ELAINE GREGORY, individually; ESCAMBIA COUNTY, FLORIDA

dba Escambia County Sheriff's Department and the Escambia County Detention Center; or

ESCAMBIA COUNTY SHERIFF'S DEPARTMENT dba ESCAMBIA COUNTY

DETENTION CENTER; PRISON HEALTH SERVICES, INC. (PHS); and ARMOR

CORRECTIONAL HEALTH SERVICES, INC. (ACHS), and TASER

INTERNATIONAL, INC. (Taser International)  and in support thereof states the following:

### INTRODUCTION

1.    This is an action for damages arising out of Mr. Jerry Preyer's death on June 13,

2006.  J. V. Preyer, as the personal representative of Jerry Preyer's estate, brings

these claims on behalf of all potential beneficiaries and survivors of Jerry Preyer and

on behalf of Jerry Preyer's estate for damages as set out in the Florida Wrongful

Death Statute, and other applicable state and federal law.

2.   These claims concern an incident occurring on June 13, 2006, in the Escambia
     County Detention Center, in Escambia County, Florida, while Mr. Jerry Preyer was
     in the custody of the Escambia County Detention Center and Escambia County
     Sheriff's Department. The actions and/or inactions of the employees of these
     entities and other employees of entities providing services under contract to the
     entities, along with the lack of proper training and procedures, or failure to
     implement procedures, resulted in a series of events that ultimately led to Mr.
     Preyer's death on June 13, 2006.

3.   This is a civil action against Defendants brought pursuant to 42 U.S.C. §§ 1983,
     1988 and the common law of the State of Florida for injury resulting in death,
     contributed to by excessive physical force and use of a Taser on June 13, 2006,
     wherein Plaintiff's decedent was shot ("Tasered") multiple times with a Taser
     weapon manufactured by Taser International, Inc. Plaintiff seeks damages against
     the certain government defendants and other individuals, for committing acts,
     under color of state law, which deprived the Plaintiff of federal constitutional
     Civil Rights. Plaintiff also invokes the Court's supplemental jurisdiction pursuant
     to 28 U.S.C. § 1367 over State of Florida common law claims arising from the
     same facts and circumstances as the claims arising under federal law which
     include: negligence; negligent failure to warn; negligent design, assembly or
     distribution; gross negligence; and strict liability (failure to warn, manufacturing
     defect and design defect).

4.   Plaintiff has served Notice of Claims with various Florida State Agencies,

including Escambia County, Escambia County Sheriff's Department, Escambia County Detention Center, Escambia County Health Department, Florida Department of Financial Services, as well as private entities providing services to these State Agencies, in compliance with Florida Statute 768.28. Plaintiff reserves the right to Amend this Complaint to add state and common law claims against these entities who are subject to the qualified waiver of sovereign immunity as set out in Florida Statute 768.28.

5.     A petition for extension of the statute of limitations for medical negligence claims, pursuant to Florida Statute 766.104(2), was filed in Circuit Court of Escambia County on June 6, 2008. A separate Petition pursuant to Florida Statute 766.104(2) is filed contemporaneous with this action in this Court to establish the 90 extension for medical negligence pre-suit investigation as conditions precedent to filing medical negligence claims. These petitions pertain to medical negligence claims subject to the pre-suit investigation requirements as set out in Florida Law for state medical negligence claims, including those claims against entities that are not subject to the Notice provisions of Florida Statute 768.28. Plaintiff reserves the right to amend this action to add non-Section 1983 medical negligence claims that are subject to the Florida medical negligence pre-suit investigation requirements. See Exhibit A.

6.     Entities for which medical negligence claims may arise include some of the individuals listed above, as well as Armor Health Services and/or Prison Health Services (PHS), acting through their employees, as well as any other employers of

any individuals referenced herein. Non-medical negligence claims subject to the Notice provisions and other provisions of § 768.28 are subject to the 4 year statute of limitations as set out in § 768.28(14).

## JURISDICTION AND VENUE

7.    Plaintiff has brought federal law claims against Defendants under 42 U.S.C. §§ 1983 and 1988, as well as state common law claims which arise out of the same events or occurrences as the federal claims, to remedy the deprivation, under color of state law, of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. This Court has subject matter jurisdiction, pursuant to 28 U.S.C, §§ 1331, 1343 (1), (2) and (3), providing jurisdiction for claims arising under a federal question, and for protection of civil rights, and under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.    This cause of action arose out of acts and omissions in the Northern District of Florida, in Escambia County, Florida. Therefore, venue is proper under 28 U.S.C. §1391(b).

9.    Plaintiff J.V. Preyer, as the personal representative of Decedent Jerry Preyer's Estate, seeks compensation afforded all eligible survivors for the value of lost support and services pursuant to the Florida Wrongful Death Statute. J.V. Preyer also seeks damages for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury for any eligible survivors, including, but not limited to Jerry Preyer's daughter, Markisha Rene Preyer. Plaintiff also seeks any damages for any eligible survivor for his or her mental pain

and suffering.  Plaintiff seeks recovery of medical or funeral expenses due to the decedent's injury or death, either on behalf of the estate or as reimbursement to those who have paid those expenses.  Plaintiff seeks loss of the prospective net accumulations of the estate which might reasonably have been expected but for the wrongful death and reduced to present money value.  Plaintiff also seeks any other damages arising out of this incident pursuant to federal and state law, including, but not limited to, punitive damages and costs and fees as allowed under federal and state law.

## THE PARTIES

10. Plaintiff J.V. Preyer is an adult citizen and resident of Escambia County, Florida, and is the father of the deceased, Jerry Preyer, and the duly appointed personal representative of the Jerry Preyer's Estate.  J.V. Preyer was born September 1939.  He currently resides at 2801 Matthew Lane, Pensacola, Florida 32505-4921.

11. Decedent Jerry Preyer was born September 10, 1960, in Pensacola, Florida.  His social security number was 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.  At the time of his death, Jerry Preyer was 45 years old.

12. The potential beneficiaries and survivors subject to these claims include the following:  (1) Jerry Preyer's wife, Carry Bell; (2) Jerry Preyer's adult daughter, Markisha Rene Preyer Johnson, born August 9, 1979, and residing at 3501 Johnson Street, HWD Florida, 33021; (3) Jerry Preyer's father, J.V. Preyer, an adult, residing at 2801 Matthew Lane, Pensacola, Florida, 32505; (4) Jerry Preyer's three siblings, Joanna Preyer Woodson, Beverly Annett Dennis (born

September 13, 1962) and Melvin Lee Preyer (born July 4, 1961); and (5) Jerry Preyer's granddaughter, Destiny Johnson, age 6.

13. Defendant SHERIFF RON McNESBY (Sheriff), is the duly elected Sheriff of Escambia County, Florida, and on information and belief, was at all times material to this action an adult citizen and resident of Escambia County, Florida, and acting in his official capacity, was responsible for the conduct of the employees and agents of the Escambia County Corrections Division for the operation of the Escambia County Detention Center or Correctional Facility, for establishing customs, policies, and procedures to regulate the conduct of agents and employees of the Escambia County Corrections Division, and for implementing and enforcing those policies, procedures and customs, and ensuring that employees and agents of the Escambia County Corrections Division obeyed the laws of the State of Florida and the United States.

14. Defendant CORPORAL RONALD HANKINSON (Corporal Hankinson), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed as a correctional officer with Escambia County, Florida for service in the Escambia County Sheriff's Department and/or the Escambia County Detention Center.

15. Defendant CAPTAIN BARBARA WERTZ (Captain Wertz) at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed with Escambia County, Florida for service in the Escambia County

Sheriff's Department and/or the Escambia County Detention Center as the administrator of the Detention Center..

16.     Defendant LIEUTENANT DAVID PHILLIPS (Lt. Phillips), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed as a correctional officer with Escambia County, Florida for service in the Escambia County Sheriff's Department and/or the Escambia County Detention Center.

17.     Defendant DEPUTY JOSEPH LAMAR BRAZWELL, JR. (Deputy Brazwell), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed as a correctional officer with Escambia County, Florida for service in the Escambia County Sheriff's Department and/or the Escambia County Detention Center.

18.     Defendant CORPORAL JOHN COVOTTA (Corporal Covotta), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed as a correctional officer with Escambia County, Florida for service in the Escambia County Sheriff's Department and/or the Escambia County Detention Center.

19.     Defendant DEPUTY SHAUN MICHAEL WHITE (Deputy White), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed as a correctional officer with Escambia County, Florida for service in the Escambia County Sheriff's Department and/or the Escambia County Detention Center.

20. Defendant LPN MARGARET GRICE (LPN Grice), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed by Prison Health Services and/or Armor Correctional Health Services, Inc., as a licensed practical nurse to provide medical care or nursing care to inmates at the Escambia County Detention Center.

21. Defendant LYNN LAIRD (Laird) at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed by Prison Health Services and/or Armor Correctional Health Services, Inc., and/or Escambia County as a counselor to provide counseling services and related assistance to mental health patients or inmates at the Escambia County Detention Center.

22. Defendant DR. PIOTR SZMURLO (Dr. Szmurlo) is a doctor, licensed in the State of Florida, and a resident of Escambia County, Florida, who at all times material to this action was providing mental health medical services on behalf of the Escambia County Detention Center.

23. Defendant Nurse CABOT WHITE (Nurse White), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed by Prison Health Services and/or Armor Correctional Health Services, Inc., as a nurse to provide medical care or nursing care to inmates at the Escambia County Detention Center.

24. Defendant Register Nurse MARY DAVIS (RN Davis), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed by Prison Health Services and/or Armor Correctional Health Services,

Inc., as a registered nurse to provide medical care or nursing care to inmates at the Escambia County Detention Center.

25.     Defendant Registered Nurse TRUDY BURTON (RN Burton), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed by Prison Health Services and/or Armor Correctional Health Services, Inc., as a registered nurse to provide medical care or nursing care to inmates at the Escambia County Detention Center.

26.     Defendant Registered Nurse ELAINE GREGORY (RN Gregory), at all times material to this action, was an adult citizen and resident of Escambia County, Florida, and employed by Prison Health Services and/or Armor Correctional Health Services, Inc., as a registered nurse to provide medical care or nursing care to inmates at the Escambia County Detention Center.

27.     Defendant ESCAMBIA COUNTY, FLORIDA, dba Escambia County Sheriff's Department and Escambia County Detention Center (County).  Escambia County Sheriff's Department and the Escambia County Detention Center (the JAIL) are political sub-divisions of the Escambia County government.  Defendant ESCAMBIA COUNTY, FLORIDA, is a governmental subdivision of the State of Florida, and a state entity organized and authorized as such by the State of Florida.

28.     The ESCAMBIA COUNTY SHERIFF'S DEPARTMENT and the ESCAMBIA COUNTY DETENTION CENTER are operated by Sheriff McNesby and Captain Barbara Wertz in their official capacities, and, as such, falls under the auspices,

control and responsibility of McNesby and Wertz. To the extent that either ESCAMBIA COUNTY SHERIFF'S DEPARTMENT and/or the ESCAMBIA COUNTY DETENTION CENTER are separate and distinct political entities from ESCAMBIA COUNTY, FLORIDA, Plaintiff sues these accordingly as separate political entities through actions against Sheriff McNesby, and Captain Barbara Wertz in their official capacity for those entities.

29.     Defendant PRISON HEALTH SERVICES, INC., (PHS) is a private foreign corporation, incorporated under the laws of a state other than Florida, who contracts and did contract with Escambia County, Florida and/or the Escambia County Detention Center or Escambia County Sheriff's Department to provide medical care to inmates in the Escambia County Detention Center during all material times to this action.

30.     Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., (ACHS) is a private foreign corporation, incorporated under the laws of a state other than Florida, who contracts and did contract with Escambia County, Florida and/or the Escambia County Detention Center or Escambia County Sheriff's Department to provide medical care to inmates in the Escambia County Detention Center during all material times to this action.

31.     Defendant, TASER INTERNATIONAL, INC., ("Taser International") is a corporation created and existing pursuant to the laws of the State of Arizona, and conducting business in the State of Florida. Taser International designs, manufactures, markets and distributes its Advanced Taser weapon to law

enforcement agencies, like Escambia County and the Escambia County Sheriff's Department and the Escambia County Detention Center, and markets and promotes the Advanced Taser as a non-lethal weapon which causes no long term injuries.

## **FACTUAL BASIS FOR CLAIM**

32.     The following facts are based upon and supported by sworn testimony of the employees and officials of the state agencies involved, as well as the testimony of the employees of the various private entities providing services under contract with the state agencies.

33.     On June 13, 2006, Jerry Preyer died while in the custody of the Escambia County Detention Center. His death was the result of excited delirium exacerbated by physical struggle and taser use. The following represents the facts leading up to Mr. Preyer's death on June 13, 2006.

34.     On or about April 27, 2006, Mr. Jerry Preyer was arrested by the Escambia County Sheriff's Office and charged with aggravated battery. At the time of his arrest and during booking at the Escambia County Detention Center, Mr. Preyer was acting unusual, claiming that he was Jesus and becoming hostile with detention deputies.

35.     During medical screening at the Detention Center, he was laughing, preaching and blurting peculiar comments. He signed his receiving and screening form as "Jesus" and identified himself as "Jesus" at the top of the screening form. EMT Stacy Taylor, an employee with Prison Health Services (PHS), during medical screening, noted on the mental health referral form that Mr. Preyer was confused or disoriented,

out of touch with reality, hyper or manic and talking with himself more than normal. Taylor referred Mr. Preyer to the infirmary for a follow-up mental health exam and notified the charge nurse. Mr. Preyer was taken to the infirmary and was ultimately released to the Crisis Stabilization Unit at Baptist Hospital on April 28, 2006.

36.     On May 23, 2006, a warrant for Preyer's arrest was issued for failure to appear concerning his April 27th arrest for aggravated battery. As a result of this warrant, Mr. Preyer was arrested by Deputy Scott Gulsby at 1:41 p.m. on May 31, 2006. He was transported to and booked into the Escambia County Detention Center without bond.

37.     At the time of this second booking, EMT Stacy Taylor made contact with Mr. Preyer upon his arrival at the jail and completed a Prison Health Services ("PHS") receiving or screening form once again. Taylor recalled Preyer from the April arrest and remembered that he exhibited mental health problems at that time. On this occasion, unlike before, Mr. Preyer was noted as alert and oriented, calm and cooperative, and having a normal mood.

38.     Mr. Preyer informed EMT Taylor that he had been hospitalized for schizophrenia by a psychiatrist at the Lakeview Center and that, as a result, he was taking Haldol and Cogentin as prescribed by a physician. Mr. Preyer reported to EMT Taylor that his last dose was earlier that day.

39.     EMT Taylor completed a Lakeview Center authorization to release information concerning Preyer's medical history and mental health treatment, and Mr. Preyer signed his "correct" name to this release. EMT Taylor also completed an Escambia

County Detention Center mental health referral form indicating that Mr. Preyer reported suffering from Schizophrenia and taking Haldol and Cogentin. EMT Taylor started a medical file for Mr. Preyer and completed a PHS progress notes report summarizing and documenting information she obtained from Mr. Preyer during the screening process. Mr. Preyer was then moved to the housing unit in the main jail.

40.    On June 1, 2006, the medical release form filled out by EMT Taylor was faxed to the Lakeview Center. On that same day, Lakeview Center faxed back Dr. Sompalli's medical notes report. Dr. Sompalli's report confirmed that he had previously seen Mr. Preyer and prescribed Haldol and Cogentin to treat schizo-affective psychosis.

41.    Also on Thursday, June 1, 2006, Mr. Preyer obtained and filled out a PHS inmate medical request form requesting Haldol and vitamins. On Friday, June 2, 2006, LPN Margaret Grice, working for Prison Health Services and/or Armor Health Services, picked up a "sick call slip" from Mr. Preyer, signed the slip and forwarded the PHS inmate medical request form to the medical health unit for follow-up. Grice reported that Mr. Preyer did not appear to be having any problems that required immediate medical or mental health attention at that time.

42.    On Tuesday, June 6, 2006, Mr. Lynn Laird a mental health counselor employed at the Detention Center, directly or through Prison Health Services or Armor Health Services, reviewed the Escambia County Detention Center mental health referral form completed by EMT Taylor. He also reviewed the June 1 PHS inmate medical

request form that was signed by LPN Grice, wherein Mr. Preyer requested his Haldol and "vitamins," and noted (apparently directed to Mr. Preyer) that he was sorry, but they do not provide sleep medication in the Detention Center. Laird indicated that although he knew that Haldol and Cogentin (that had been previously prescribed) were commonly used psychotropic drugs, he chose not to investigate Mr. Preyer's medical request any further because he purportedly did not have the receiving screening form or the Lakeview Center medical notes, which were in actuality in Mr. Preyer's file in the Detention Center. Laird determined that no action would be taken until information was received from Lakeview Center, even though the information had already been sent on June 1st (five days before) and was contained in Mr. Preyer's medical file.

43.     Dr. Szmurlo came to the Detention Center on Tuesdays and Thursdays. June 6, 2006, was a Tuesday. Dr. Szmurlo was responsible for determining who received medications, and he would not prescribe any medications to an inmate without written verification of the prescription from the original source or claimed source that the inmate provided. So, almost a week after (1) Mr. Preyer notified the Detention Center medical staff that he had been prescribed Haldol and Cogentin for mental disorder and was still taking the medication when he was processed on May 31, (2) confirmation from Lakeview Center that Mr. Preyer had been prescribed the medication, (3) Mr. Preyer specifically requested that he be provided his medications, and (4) a review of his medical file by mental health agents, Dr.

Szmurlo denied Mr. Preyer the requested medications to treat his schizophrenia and psychotic syndrome.

44. This denial continued through Friday morning, June 9, 2006, when Mr. Preyer's cellmates notified Deputy James Mayberry that Mr. Preyer was acting strangely, claiming to be God and saying other "crazy things." Mayberry informed his supervisor, Corporal James Meredith, who advised Mayberry to have Mr. Preyer moved. Mr. Preyer was moved to Cell 8-C in the blue four housing unit orange pod. At 2:30 p.m. Mr. Preyer became disruptive in his new cell, throwing his cellmate's property in the trash and claiming the devil was in the housing unit.

45. Deputy Randy Wentz, who was working in the blue four housing unit, notified Corporal Meredith and was instructed to have Mr. Preyer taken to the infirmary to be evaluated by the medical staff. Deputy Jerry Champion escorted Mr. Preyer to the infirmary without incident. Deputy Speller, in the infirmary, reported that Mr. Preyer was acting calm and non-violent, but was acting strange, and in her opinion was having some mental health issues. Mr. Preyer was seen by Nurse Cabot White, who claims to have not examined Mr. Preyer and had little contact with him.

46. After this non-examination, Mr. Preyer was moved to the administrative confinement unit. Corporal Meredith filled out the administrative confinement form to be held pending mental health evaluation. No documentation exists concerning Mr. Preyer's trip to the infirmary or indicating mental health was notified of Mr. Preyer's need for evaluation.

47.    On Monday, June 12, 2006, RN Mary Davis conducted a routine examination of Mr.
       Preyer and completed a Prison Health Services health evaluation form and mental
       health questionnaire.  At this time, Preyer, again, told the health care provider,
       Davis, that he suffered from schizophrenia and psychosis and that he was prescribed
       Haldol and Cogentin, as noted on the form by RN Davis.  Davis knew Mr. Preyer
       had a mental issue but purportedly assumed he was being seen by mental health.
       Nothing was done in response to Mr. Preyer's evaluation, in spite of the information
       provided for the mental health questionnaire.

48.    On Tuesday, June 13, 2006, almost two full weeks after Mr. Preyer had his last dose
       of Haldol and Cogentin, after he had first requested his medications, and after the
       Detention Center had obtained Mr. Prayer's Lakeview medical records, the
       Detention Center psychiatrist, Dr. Szmurlo, finally reviewed Mr. Preyer's medical
       file, apparently for the first time.  Based on this review and without seeing Mr.
       Preyer, Dr. Szmurlo ordered Haldol and Cogentin to be administered to Mr. Preyer.
       His orders were documented on a PHS physician order form and forwarded to the
       nurse's station in the infirmary.

49.    Later that same day, between 3:00 p.m. and 3:30 p.m., Mr. Preyer's cellmate notified
       Deputy Chris Weaver that Mr. Preyer had tampered with his property.  Deputy
       Weaver notified Deputy Dallas King and Corporal Scott Nash who responded to Mr.
       Preyer's cell.  Mr. Preyer began throwing his cellmate's property out of the cell,
       talking incoherently and violently shaking the bars of his cell.  Cellmate Anthony
       advised King and Nash that Mr. Preyer had been drinking water out of the toilet.

50.    Following this incident, at approximately 3:53 p.m., Mr. Preyer was uneventfully
       moved by Deputy King to the phase one holding tank, cell 131. Seven minutes later,
       at 4:00 p.m., Deputy King was called back to the holding cell and observed Mr.
       Preyer wet, in a karate stance with his jumpsuit rolled down, acting crazy, jumping
       up in the air and kicking the cell door. King called Corporal Ryals who decided to
       place Mr. Preyer in a restraint chair. King talked to Mr. Preyer in an attempt to calm
       him down. Mr. Preyer then sat in the restraint chair without incident and was
       secured.

51.    After Mr. Preyer was restrained in the chair, Nurse Trudy Burton (employee of PHS
       or ACHS) examined Mr. Preyer and had an opportunity to observe his behavior and
       gather a history of his actions. At 5:30 p.m. Corporal Ryals and Nurse Burton
       checked on Mr. Preyer a second time and noted that he was okay, singing, humming
       and calm. However, he was apparently left in the restraint chair.

52.    At 6:00 p.m. Corporal Hankinson, a supervisor for the oncoming shift was notified
       that Mr. Preyer was in a restraint chair in holding cell 131. At 7:00 p.m. Deputy
       Roger Larivier, assigned to Central Control, was also notified that Mr. Preyer was in
       the restraint chair. Deputy Larivier was provided a 15 minute check sheet to
       monitor Mr. Preyer. At 7:17 p.m. Corporal Hankinson looked in on Mr. Preyer
       while he made his initial rounds. Over the next hour, Deputy Larivier did not note
       any problems with Mr. Preyer.

53.    At 7:30 p.m. Nurse Burton notified Nurse Elaine Gregory (employed by PHS or
       ACHS), the oncoming nurse, that Mr. Preyer was in a restraint chair. At

approximately 8:10 p.m., after Mr. Preyer had spent about four hours strapped in the restraint chair, Nurse Gregory and Corporal Hankinson went into holding cell 131 and reported that Mr. Preyer was rocking the restraint chair back and forth and appeared agitated. He was speaking rapidly and was hard to understand. Mr. Preyer was able, again, to tell Nurse Gregory that he was prescribed Haldol and that he was a patient at Lakeview Center. Preyer requested his food that had been left in his cell while he was in the restraints. Deputy Shaun White arrived and assisted Corporal Hankinson in removing Mr. Preyer from the restraint chair. Mr. Preyer sat on the bench and began eating his sandwich.

54.     A decision was made to move Mr. Preyer to the infirmary overnight for observation because of his behavior and his report of being prescribed Haldol. Nurse Gregory returned to the infirmary and reviewed the medical records and determined that Dr. Szmurlo had ordered the Haldol and Cogentin earlier in the day but that Mr. Preyer had not had his medication since he had been in the Detention Center, i.e., since May 31. She prepared the medical documentation and prepared the medication as ordered with the purported intention of returning to Mr. Preyer's cell to give him the first dose of Haldol he would have since May 31.

55.     At 9:05 p.m. Deputy Larivier called deputies to Mr. Preyer's cell because Mr. Preyer had stripped off all of his clothes and was drinking water from the toilet. Lieutenant Phillips and Deputy Brazwell arrived and confirmed Deputy Larivier's observations. Attempting to talk to him, they received no intelligent response. Attempts to have him voluntarily get up from the toilet and put on his clothes were unsuccessful.

After Corporal Hankinson arrived, the three corrections officers pried the 5'5", 141 pound Mr. Preyer up from the toilet to a standing position. While Mr. Preyer purportedly resisted, Corporal Hankinson was able to get a handcuff on Mr. Preyer's left wrist. Corporal Covotta arrived and joined in to assist in getting Mr. Preyer's arms together for cuffing. At some point, Corporal Hankinson announced that Mr. Preyer was attempting to pull the Taser from Lieutenant Phillips' Taser holster. In purported response, Corporal Hankinson reached around Lieutenant Phillips and fired his own Taser at Mr. Preyer. Reportedly, the 5'5", 141 pound Mr. Preyer continued to struggle and resist being handcuffed and Corporal Hankinson tazed him again. Mr. Preyer and the deputies fell to the floor. Deputy White arrived and observed Lieutenant Phillips, Deputy Hankinson, Deputy Brazwell and Corporal Covotta struggling with Mr. Preyer, who was lying on his stomach in the back of the cell but still resisting being handcuffed.

56. Deputy White joined in, restraining Mr. Preyer's legs. Lieutenant Phillips told Corporal Hankinson to taze Mr. Preyer again. Instead, Deputy White drew his taser and removed the probe cartridge and directly tazed Mr. Preyer in his lower back. The taze reportedly had no effect. Corporal Hankinson then removed the probe cartridge from his tazer and applied a direct contact taze to one of Mr. Preyer's calves. After multiple tazing, they were able to get Mr. Preyer handcuffed at that time. As he continued to lay on the floor, he began vomiting.

57. After the restraint chair was retrieved by Deputy Friemier, Mr. Preyer was placed in the chair (with resistance) and began vomiting again. Nurse Gregory arrived to see

part of the struggle and to see Mr. Preyer being restrained in the chair. She was unable to administer the medications during these events. After being secured in the chair, and at the instruction of Nurse Gregory, Mr. Preyer was moved to the infirmary and placed in cell 265 at approximately 9:30 p.m. In the infirmary cell, Nurse Gregory found Mr. Preyer's face and chest covered in vomit. She initially noticed his breathing become more rapid and labored. He began to gurgle, cough and vomit more. He was released from the restraint chair and laid on the floor and continued to vomit. At that point, no respirations or pulse were detected. Attempts to resuscitate were unsuccessful. Although a defibrillator was retrieved, no defibrillation occurred at that time. CPR was ineffective due to continued vomiting. A suction machine was retrieved but could not be used in the cell due to the absence of power. He was dragged out into the hallway to allow access to power for the suction machine, but ultimately, suctioning and CPR were ineffective. He was treated by EMS and paramedic personnel who arrived and attempted further resuscitation with limited success. Mr. Preyer arrived at Baptist Hospital in full cardiac arrest. Further attempts to resuscitate were unsuccessful and Mr. Preyer was pronounced dead at 10:08 p.m. Based upon a June 14 autopsy, Dr. Andrea Minyard concluded that the cause of death was excited delirium with physical struggle and taser use as contributing factors.

58.     Claimant and personal representative J.V. Preyer provides this notice and brings this claim against any State Agencies or sub-agencies or contractors subject to the provisions of Florida Statute § 768.28. These claims are based upon the negligent,

reckless and/or wanton conduct of the above referenced employees of these state

agencies and contracted service providers who, during the period in question, were

providing services to the Escambia County Sheriff's Department or Escambia

County Detention Center, or any other state agency, and that may be subject to the

notice requirements of Florida Statute § 768.28. In addition, this Notice includes

any claims based upon the conduct of employees of the Escambia County

Sheriff's Department, the Escambia County Detention Center, or agents of these

entities that may be subject to Florida Statute § 768.28 (whether specifically

named above or not) that are responsible for the training of employees for these

state agencies or are responsible for development and implementation of policies

and procedures related to carrying out the functions of these state agencies, and

who were negligent, wanton or reckless in the manner of fulfilling those

responsibilities and contributed to cause Decedent Jerry Preyer's death. These

claims are in addition to other claims based upon the negligence, wanton or reckless

conduct of entities not subject to the immunity waivers or immunity protections

afforded state agencies, and other claims based upon violations of Mr. Jerry Preyer's

civil rights pursuant to the United States Constitution and applicable Amendments

and statutes, and other applicable law.

**Factual allegations related to all Counts against Defendant, Taser International, Inc.**

59.    Taser International's electronic weapons are marketed and sold to law

enforcement agencies throughout the State of Florida, including Escambia County

and the Escambia County Sheriff's Department and the Escambia County

Detention Center to be used on inmates and pre-trial detainees such as Jerry Preyer.

60.     Taser International began operations in Arizona in 1993 for purposes of developing and manufacturing non-lethal, self-defense weapons and began marketing its Advanced Taser Product line to law enforcement in 1999.

61.     The Advanced Taser Product weapon line consists of three versions: the M26, the Ml 8, and X26. The M26 is more powerful than the Ml 8 and X26 and is the product line most frequently sold to law enforcement. The M26 is also the product line sold to the Escambia County Sheriff's Department.

62.     The Advanced Taser is not considered a "firearm" by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives and, as such, no firearms regulations apply to the sale or distribution of the weapons.

63.     The Advanced Taser M26 is an electric weapon which uses compressed nitrogen to shoot two probes up to 15-21 feet. The probes are connected to the weapon by high-voltage insulated wire.  Once contact with the target occurs, the Advanced Taser M26 transmits powerful electrical pulses along the wires and into the body of the target subject.

64.     The M26 Advanced Taser is designed to hit the target subject with 50,000 volts or 26 watts of electricity automatically fired for a period of five seconds.

65.     The hits police officers receive from the M26 Advanced Taser during training have little in common with the shocks given to suspects.  In training, volunteers usually receive a single shock of a half-second or less whereas in the field, Tasers

automatically fire for five seconds.  If an officer holds down the M26 Advanced

Taser trigger for more than five seconds, the M26 will discharge longer than the

five second interval.

66.     Taser International markets the Advanced Taser M26 as a non-lethal weapon

which does not cause long term injuries.  In fact, Taser's own literature sets forth

the Advanced Taser M26 cannot cause long term injuries and can only cause short

term injuries in the form of minor skin irritation.

67.     Taser International boasts in its annual report over 7,000 law enforcement

agencies have made purchases of its Taser brand devices for testing or

deployment, including agencies within the State of Florida.

68.     The largest police departments have been slow to purchase Taser weapons.  In

fact, the New York City Police Department owns only a handful of Tasers, which

are used by specialized units and supervisors.

69.     Despite Taser International's contentions as to the non-lethal nature of their

electric weapons, many reports have been made of people dying in the United

States and Canada after being struck by Advanced Taser M26 guns.  In addition,

many people have reported permanent injuries as a result of having been struck by

the Advanced Taser M26 weapon.

70.     Taser International has a history of claims and pending lawsuits in state and

federal court made for wrongful death and serious injury associated with its Taser

products, including the M26.  In addition, Taser International has received

notification from several claimants of wrongful death and/or personal injury

claims at the pre- suit stage of litigation.

71.     Despite the growing evidence of dangers and risks associated with Advanced
        Taser usage by law enforcement, including permanent injury and death, Taser
        International continues to market its weapons to law enforcement as safe with no
        risk of causing permanent injury or death.

72.     An estimated 100,000 police officers across the United States now carry
        Advanced Tasers, 20 times the number in 2000. Taser International's net sales
        reflect wide spread distribution to law enforcement agencies around the United
        States. Taser International's net sales increased $43.2 million, or 177%, to $67.6
        million for 2004 compared to $24.5 million for 2003.

73.     Taser International's total market value, based Taser International's Common
        Stock sales price as reported by NASDAQ, as of March 15, 2005 was $825.5
        million.

74.     Despite the $67.6 million earned in net sales and $825.5 million in market value,
        Taser International spent only $823,593 in research and development in 2004
        amidst growing claims Advanced Tasers are causing permanent injury and death.

75.     A recent study titled "Human Effectiveness and Risk Characterization of the
        Electromuscular Incapacitation Device - a Limited Analysis of the Taser"
        (hereafter "HERC EID-Taser Study") published by the Joint Non-Lethal Weapons
        Human Effects Center of Excellence sets forth Advanced Tasers may cause
        several unintended effects, including, but not limited to changes in blood pressure
        and heart rate, peripheral nerve injury, mechanical muscle injury, bone fracture,

seizure, and acute respiratory impairment and failure.

76.     Taser International has purposefully marketed Advanced Taser weapons as safe,

        non-lethal, and incapable of inflicting permanent injury.

77.     Taser International's representations that the M26 Advanced Taser and Advanced

        Taser product line is safe and incapable of inflicting serious injury or death

        conflicts with the real world fact people have died and suffered permanent injuries

        after being struck by the M26 Advanced Taser and Advanced Taser product line.

## COUNT I

## 42 U.S.C. §1983 CLAIM FOR DENIAL OF MEDICAL TREATMENT FOR SERIOUS MEDICAL NEED

## (Defendants LPN Grice, Mental Health Counselor Laird, Nurse White, RN Davis, RN Burton, RN Gregory, Dr. Szmurlo)

78.     This claim is based in part upon the facts as set out in paragraphs one through

        fifty-eight above, and those facts are incorporated herein by reference.

79.     Following Jerry Preyer's May 31, 2006, incarceration in the Escambia County

        Detention Center, Defendants, LPN GRICE, COUNSELOR LAIRD, NURSE

        WHITE, RN DAVIS, RN BURTON, RN GREGORY and DR. SZMURLO,

        acting under color of state law, were each involved in the examination and

        evaluation of Jerry Preyer and participated in the medical care and treatment

        provided to Jerry Preyer during the applicable period of time between May 31 and

        June 13, 2006, as more fully set out in paragraphs thirty-two though 58, above.

80.     During the applicable time periods, Defendants, LPN GRICE, COUNSELOR

        LAIRD, NURSE WHITE, RN DAVIS, RN BURTON, RN GREGORY and DR.

SZMURLO knew, or but for their deliberate indifference to Mr. Preyer's serious medical needs would have known, of Mr. Jerry Preyer's status as a schizophrenic and psychotic patient, and that prior to his May 31 incarceration, his condition was being controlled by Haldol and Cogentin.

81.  Despite their knowledge of the Ward's serious medical condition, Defendants, LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS, RN BURTON, RN GREGORY and DR. SZMURLO were repeatedly and deliberately indifferent to Jerry Preyer's serious medical needs, failed to perform appropriate diagnostic testing and delayed the provision of medical treatment in violation of Jerry Preyer's constitutional rights to reasonable medical care for serious medical needs.

82.  Upon admission to the JAIL, Jerry Preyer was medically screened by EMT Taylor.  EMT Taylor noted that Mr. Preyer informed her of his mental condition (schizophrenia and psychosis), his status as a mental patient with Lakeview Center, the prescription medications he had been prescribed to treat his mental condition, and that his last dose of medication was earlier in the day. Documentation was prepared confirming these facts and to retrieve medical records from Lakeview Center.

83.  Lakeview documentation arrived the next morning confirming Mr. Preyer's statements concerning his serious mental illness and the medications he was prescribed to treat that illness.

**SPECIFIC CONDUCT OF DEFENDANT LPN MARGARET GRICE**

84. On June 1, Defendant LPN Grice was provided the inmate request form from Mr.
Preyer requesting his medication through PHS. In spite of the information
gathered by EMT Taylor's on Mr. Preyer's intake indicating Mr. Preyer's mental
patient status and medication status and the medical file, EMT Taylor opened on
Mr. Preyer's behalf, and Defendant Grice's June 2 receipt of the medication
request made by Mr. Preyer on June 1, Defendant Grice took no steps to address
Mr. Preyer's serious mental health needs, and denied Mr. Preyer medical
treatment for a serious medical and mental need in deliberate indifference to those
needs. Defendant LPN Grice had ample opportunity to take steps to address Mr.
Preyer's serious medical need, but took no action whatsoever in that regard.

85. As a direct and proximate result of Defendant Grice's deliberately indifferent
denial of Mr. Preyer's serious medical needs, Mr. Preyer did not begin receiving
his prescribed medications required to control his schizophrenia and psychosis
and that failure to meet those needs ultimately resulted in the excited delirium that
contributed to cause Mr. Preyer's death.

## SPECIFIC CONDUCT OF DEFENDANT LYNN LAIRD

86. Likewise, on Tuesday, June 6, 2006, Defendant Lynn Laird, acting under color of
law as a mental health counselor employed at the Detention Center, directly or
through Prison Health Services or Armor Health Services, reviewed the Escambia
County Detention Center mental health referral form completed by EMT Taylor. He
also reviewed the June 1 PHS inmate medical request form that was signed by LPN
Grice, wherein Mr. Preyer requested his Haldol and "vitamins," and noted

(apparently directed to Mr. Preyer) that he was sorry, but they do not provide sleep medication in the Detention Center. Even though Laird knew that Haldol and Cogentin (that had been previously prescribed) were commonly used psychotropic drugs, he chose not to investigate Mr. Preyer's medical request any further and therefore failed to learn that the confirming Lakeview Center medical notes were in Mr. Preyer's file in the Detention Center, and failed to take any action whatsoever to see that Mr. Preyer's serious medical needs were met in deliberate indifference to those needs.

87.    As a direct and proximate result of Defendant Laird's deliberately indifferent denial of Mr. Preyer's serious medical needs, Mr. Preyer did not begin receiving his prescribed medications required to control his schizophrenia and psychosis and that failure to meet those needs ultimately resulted in the excited delirium that contributed to cause Mr. Preyer's death.

**SPECIFIC CONDUCT OF DEFENDANT NURSE CABOT WHITE**

88.    On June 9, 2006, nine days after Mr. Preyer last had any treatment for his schizophrenia and eight days after he specifically requested his medication, Mr. Preyer's cellmates notified correctional officers that Mr. Preyer was acting strangely, claiming to be God and saying other "crazy things." After being moved to a different cell for closer observation, Mr. Preyer became disruptive again in a schizophrenic manner, throwing his cellmate's property in the trash and claiming the devil was in the housing unit. Shortly thereafter he was escorted to the infirmary to

be evaluated. Deputy Speller noted that he was acting calm but strange at that time, and appeared to have mental problems.

89. Defendant Nurse White, acting through PHS or ACHS, was the nurse on duty to perform the evaluation. However, she claims not to have done any evaluation, did not review his chart, did not review the previous request for medical treatment, did not provide any type of medical treatment or suggest any type of referral to address Mr. Preyer's serious mental and medical needs, in deliberate indifference to those needs.

90. As a direct and proximate result of Defendant Nurse White's deliberately indifferent denial of Mr. Preyer's serious medical needs, Mr. Preyer did not begin receiving his prescribed medications required to control his schizophrenia and psychosis and that failure to meet those needs ultimately resulted in the excited delirium that contributed to cause Mr. Preyer's death.

## SPECIFIC CONDUCT OF DEFENDANT RN MARY DAVIS

91. On Monday, June 12, 2006, twelve days after Mr. Preyer received any medications to treat his serious mental and medical condition, Defendant RN Davis, acting under color of law through PHS or ACHS, conducted a routine examination of Mr. Preyer and completed a PHS health evaluation form and mental health questionnaire. She was told directly by Mr. Preyer that he suffered from schizophrenia and psychosis and that he was prescribed Haldol and Cogentin, as noted on the form by RN Davis. In spite of Defendant RN Davis' knowledge of Mr. Preyer's serious mental condition, she never once reviewed his chart to determine whether his condition was

being treated, she never once reviewed the medical request for medications or took any action to determine if Mr. Preyer was being treated for his serious medical and mental needs, in deliberate indifference to those needs.

92. As a direct and proximate result of Defendant Laird's deliberately indifferent denial of Mr. Preyer's serious medical needs, Mr. Preyer did not begin receiving his prescribed medications required to control his schizophrenia and psychosis and that failure to meet those needs ultimately resulted in the excited delirium that contributed to cause Mr. Preyer's death.

### SPECIFIC CONDUCT OF DEFENDANT RN TRUDY BURTON

93. On Tuesday, June 13, 2006, almost two full weeks after Mr. Preyer had his last dose of Haldol and Cogentin, after he had first requested his medications, and after the Detention Center had obtained Mr. Preyer's Lakeview medical records, the Detention Center psychiatrist, Dr. Szmurlo, finally reviewed Mr. Preyer's medical file, apparently for the first time. Based on this review and without seeing Mr. Preyer, Dr. Szmurlo ordered Haldol and Cogentin to be administered to Mr. Preyer. His orders were documented on a PHS physician order form and forwarded to the nurse's station in the infirmary. No immediate action was taken concerning Dr. Szmurlo's Order.

94. Later that same day, between 3:00 p.m. and 3:30 p.m., Mr. Preyer's cellmate notified deputies that Mr. Preyer tampered with his property, had been drinking out of the toilet. Deputies observed Mr. Preyer throwing his cellmate's property out of the cell, talking incoherently and violently shaking the bars of his cell.

95.     In response to this behavior, at approximately 3:53 p.m., Mr. Preyer was
        uneventfully moved by Deputy King to the phase one holding tank, cell 131. Seven
        minutes later, at 4:00 p.m., Deputy King was called back to the holding cell and
        observed Mr. Preyer wet, in a karate stance with his jumpsuit rolled down, acting
        crazy, jumping up in the air and kicking the cell door. King called Corporal Ryals
        who decided to place Mr. Preyer in a restraint chair. King talked to Mr. Preyer in an
        attempt to calm him down. Mr. Preyer then sat in the restraint chair without incident
        and was secured.

96.     After Mr. Preyer was restrained in the chair, Defendant RN Trudy Burton (employee
        of PHS or ACHS), acting under color of law, examined Mr. Preyer and had an
        opportunity to observe his behavior and gather a history of his actions. In spite of
        her awareness of the history of schizophrenic and psychotic behavior
        contemporaneous with her own observations, Defendant RN Trudy Burton did not
        follow-up by reviewing Mr. Preyer's chart, determining what medications he was
        on, or what medication he should have been on. She did not determine or discover
        Dr. Szmurlo's Order for Haldol and Cogentin, and took no action to treat Mr.
        Preyer's serious medical need in deliberate indifference to those needs.

97.     As a direct and proximate result of Defendant RN Burton's deliberately
        indifferent denial of Mr. Preyer's serious medical needs, Mr. Preyer did not begin
        receiving his prescribed medications required to control his schizophrenia and
        psychosis and that failure to meet those needs ultimately resulted in the excited
        delirium that contributed to cause Mr. Preyer's death.

## SPECIFIC CONDUCT OF DEFENDANT RN ELAINE GREGORY

98. At 7:30 p.m. on June 13, Nurse Burton notified Defendant RN Elaine Gregory
(employed by PHS or ACHS), the oncoming nurse, that Mr. Preyer was in a restraint
chair. At approximately 8:10 p.m., after Mr. Preyer had spent about four hours
strapped in the restraint chair, Nurse Gregory, acting under color of law, observed
Mr. Preyer in his holding cell (cell 131) rocking the restraint chair back and forth
and appearing agitated. Although she had a hard time understanding him, Mr.
Preyer was able, again, to tell Nurse Gregory that he was prescribed Haldol and that
he was a patient at Lakeview Center.

99. In spite of these observations of erratic and unusual behavior, and her knowledge of
Mr. Preyer's recent history that resulted in his prolonged placement in the restraint
chair, and Mr. Preyer's exclamations to her that he was a mental patient, prescribed
Haldol and Cogentin to treat his condition, Defendant RN Gregory took no
immediate action to address Mr. Preyer's serious mental and medical need and failed
to determine that he had not been receiving his medications, and took no steps to
provide immediate treatment.

100. Eventually, Defendant RN Gregory returned to the infirmary and determined that
Mr. Preyer had not been receiving his medications. After reviewing his medical file
for the first time, she determined that Dr. Szmurlo had ordered the Haldol and
Cogentin earlier in the day but that Mr. Preyer had not had his medication since he
had been in the Detention Center, i.e., since May 31. She purportedly prepared the
medical documentation and prepared the medication as ordered with the purported

intention of returning to Mr. Preyer's cell to give him the first dose of Haldol. But her review and response came to late to make a difference in Mr. Preyer's case.

101. As a direct and proximate result of Defendant RN Gregory's deliberately indifferent denial of Mr. Preyer's serious medical needs, Mr. Preyer did not begin receiving his prescribed medications required to control his schizophrenia and psychosis and that failure to timely meet those needs ultimately resulted in the excited delirium that contributed to cause Mr. Preyer's death.

## SPECIFIC CONDUCT OF DEFENDANT DR. PIOTR SZMURLO

102. Dr. Szmurlo made routine visits to the Detention Center every Tuesday and Thursday. Dr. Szmurlo was responsible for determining who received medications, and he would not prescribe any medications to an inmate without written verification of the prescription from the original source or claimed source that the inmate provided. Mr. Preyer was processed on Wednesday May 31, at which time he provided EMT Taylor with his history as a mental patient at Lakeview Center with schizophrenia and psychosis requiring treatment with Haldol and Cogentin. A chart and medical file was prepared at that time, and on June 1, Lakeview Center faxed over confirmation of Mr. Preyer's history and prescriptions.

103. Dr. Szmurlo apparently reviewed patient charts or had an opportunity to review charts on June 1 (Thursday). Although all verification was present in Mr. Preyer's chart to confirm his condition and treatment, Dr. Szmurlo took no action concerning Mr. Preyer medical needs. Dr. Szmurlo was ostensibly present in the Detention Center for his routine visit on Tuesday, June 6, and had opportunity to review Mr.

Preyer's records, yet no action was taken to address Mr. Preyer's serious medical
need. On Thursday, June 8, Dr. Szmurlo was again ostensibly present to review
patient charts, and again, no action was taken to address Mr. Preyer's serious
medical needs.

104.   On Tuesday, June 12, Dr. Szmurlo finally reviewed Mr. Preyer's medical file and
       determineed that he should have been receiving the Haldol and Cogentin that he had
       been on and that had controlled his schizophrenia and psychosis prior to his
       incarceration. And he learned that Mr. Preyer had not received any of the
       medication (even though Mr. Preyer personally requested the medication in writing
       on June 1) since he was processed on May 31, approximately 14 days earlier.

105.   Even then, Dr. Szmurlo did not take steps to see Mr. Preyer to determine his
       condition after having gone without his medication for two weeks, and did not insure
       that he received his medications immediately, even though he did issue an Order to
       start the medications.

106.   As a direct and proximate result of Defendant Dr. Szmurlo's deliberately
       indifferent denial of Mr. Preyer's serious medical needs over the course of 13
       days, Mr. Preyer did not begin receiving his prescribed medications required to
       control his schizophrenia and psychosis and that failure to timely meet those
       needs ultimately resulted in the excited delirium that contributed to cause Mr.
       Preyer's death.

107.   Defendants, LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS,
       RN BURTON, RN GREGORY and DR. SZMURLO acted in total willful and

wanton disregard of Jerry Preyer's constitutional rights to be free from cruel and unusual punishment and to be provided with reasonable and proper medical services for his serious medical needs.

108. Jerry Preyer's treatment by Defendants LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS, RN BURTON, RN GREGORY and DR. SZMURLO fell so well below the applicable standard of care and was so cursory, grossly inadequate and incompetent as to violate the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

109. Defendants LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS, RN BURTON, RN GREGORY and DR. SZMURLO while acting under color of law and by virtue of the authority vested in them by the State of Florida, and its agencies, demonstrated deliberate and willful and wanton indifference to Jerry Preyer's serious medical needs and allowed Jerry Preyer's mental and medical condition to deteriorate substantially and to a critical state, and failed to address his serious mental and medical needs, in violation of his constitutional rights as secured by the Fourth, Fifth, and Fourteenth Amendments.

110. Each of these Defendants, LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS, RN BURTON, RN GREGORY and DR. SZMURLO, acting under color of law, had opportunities to and did observe his deteriorating condition, and were aware of his serious mental and medical needs.

111. Despite observations of Jerry Preyer's deteriorating mental condition, Defendants LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS, RN

BURTON, RN GREGORY and DR. SZMURLO failed to take steps to further

evaluate Mr. Preyer's condition, to determine or evaluate the cause of his mental

deterioration, or to review his medical record to determine what was or was not

being done to treat his condition, in total disregard and deliberate indifference to

Jerry Preyer's special and serious mental and medical needs and in violation of

his constitutional rights guaranteed by the Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution.

WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendants

LPN GRICE, COUNSELOR LAIRD, NURSE WHITE, RN DAVIS, RN BURTON, RN

GREGORY and DR. SZMURLO, jointly and severally, for compensatory damages (past

and future) as allowed under Florida's wrongful death statute and other applicable law, in

an amount as proved at trial; for an award of punitive damages; for costs, expenses, and

attorney's fees for this action in accordance with 42 U.S.C. §1988; for a trial by jury; and

for such other and further relief as the court deems just and proper.

## COUNT II

### 42 U.S.C. § 1983 - DEPRIVATION OF CIVIL RIGHTS

### DEFENDANTS, CORPORAL RONALD HANKINSON, LIEUTENANT DAVID PHILLIPS, DEPUTY JOSEPH LAMAR BRAZWELL, JR., CORPORAL JOHN COVOTTA, DEPUTY SHAUN MICHAEL WHITE

112.    Paragraphs one through fifty-eight are hereby realleged and reincorporated as if

set forth fully herein.

113.    This is an action brought against Defendants, Hankinson, Phillips, Brazwell,

Covotta, and Shaun White for violating Jerry Preyer's rights under the

Constitution and laws of the United States within the meaning of 42 U.S.C. §

1983 and under the Constitution and laws of the State of Florida.

114.    The above described actions (as stated in the Statement of Facts for June 13)

subjected Jerry Preyer to a deprivation of rights and privileges secured to Jerry

Preyer by the Constitution and laws of the United States within the meaning of 42

U.S.C. § 1983. Stated with more particularity, the above described actions

violated Decedent Jerry Preyer's Fourth, Fifth, and Fourteenth Amendment rights

and privileges as secured to Decedent Jerry Preyer's decedent by the United

States Constitution within the meaning of 42 U.S.C. § 1983.

115.    The above described actions involving Jerry Preyer were taken by these

Defendants under color of state law. The laws pertaining to freedom from the use

of excessive and unreasonable force was clearly defined, established and well

settled at the time of the actions of Defendants.

116.    Defendants actions referenced herein constitute denial of Decedent Jerry Preyer's

rights guaranteed to him by the Constitution and laws of the United States.

117.    Defendants ignored or violated standards or policies governing treatment of the

mental health patients confined in detention centers – e.g., use of excessive force,

restraints, taser weapons, and failure to coordinate observations with medical

personnel.

118.    The repeated tasering of Decedent Jerry Preyer by Defendant Hankinson and the

additional tasering by Defendant White was entirely unjustified under the

circumstances of this incident, and constituted an unreasonable and excessive use

of force.

119.   These Defendants acted recklessly, maliciously, and with deliberate indifference
       or reckless indifference toward Decedent Jerry Preyer in the deprivation of
       Decedent Jerry Preyer's Constitutional rights.

120.   As a direct and proximate result of the actions of these officers, the, 5'5", 141
       pound Jerry Preyer was subjected to enourmous physical forces from these
       defendants during the struggle along with multiple tazings that caused or
       exacerbated his excited delirium, along with his untreated mental condition and
       ultimately caused his death.

121.   Plaintiff is entitled to payment of his reasonable attorney's fees pursuant to 42
       U.S.C. §§ 1983 and 1988.

       WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendants

Corporal Ronald Hankinson, Lieutenant David Phillips, Deputy Joseph Lamar Brazwell,

Jr., Corporal John Covotta, Deputy Shaun Michael White, jointly and severally, for

compensatory damages (past and future) as allowed under Florida's wrongful death

statute and other applicable law, in an amount as proved at trial; for an award of punitive

damages; for costs, expenses, and attorney's fees for this action in accordance with 42

U.S.C. §1988; for a trial by jury; and for such other and further relief as the court deems

just and proper.

## COUNT III

### 42 U.S.C. § 1983 - DEPRIVATION OF CIVIL RIGHTS
### DEFENDANT SHERIFF RON McNESBY, CAPTAIN BARBARA WERTZ,
### ESCAMBIA COUNTY, FLORIDA, PRISON HEALTH SERVICES, INC., and
### ARMOR CORRECTIONAL HEALTH SERVICES, INC.,

122.   Paragraphs one through fifty-eight are hereby realleged and reincorporated as if set forth fully herein.

123.   This is an action brought against Defendants, SHERIFF RON McNESBY, in his official capacity for Escambia County Sheriff's Department and the Escambia County Detention Center, and CAPTAIN BARBARA WERTZ, individually and in her official capacity as the administrator of the Escambia County Detention Center, ESCAMBIA COUNTY, FLORIDA, and PHS and/or ACHS, acting under color of law, for violating Plaintiff's rights under the Constitution and laws of the United States within the meaning of 42 U.S.C. § 1983 and under the Constitution and laws of the State of Florida.

124.   The above described actions subjected Plaintiff to a deprivation of rights and privileges secured to Plaintiff by the Constitution and laws of the United States within the meaning of 42 U.S.C. § 1983. Stated with more particularity, the above described actions violated Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights and privileges as secured to Plaintiff by the United States Constitution within the meaning of 42 U.S.C. § 1983.

125.   The above described actions as set out in the Statement of Facts involving Decedent Jerry Preyer were taken by officers with the Escambia County Sheriff's Department or Escambia County Detention Center, and employees of service providers (PHS and/or ACHS) who contracted with Escambia County, Escambia County Sheriff's Department and/or Escambia County Detention Center, under

color of state law. The laws pertaining to freedom from the use of excessive and unreasonable force and cruel and unusual punishment, denial of medical treatment for serious medical needs were clearly defined, established and well settled at the time of the actions taken by these individuals acting under color of law.

126.   All of the actions of these state actors referenced herein constitute denial of Plaintiff's rights guaranteed to him by the Constitution and laws of the United States.

127.   Escambia County, Escambia County Sheriff's Department and Escambia County Detention Center, acting by and through Defendants, Sheriff McNesby and Administrator Barbara Wertz, acting individually and in their official capacity, and/or Escambia County, and PHS and/or ACHS, acting under color of law, by and through its policy makers, failed to adequately supervise, train and manage these officers and employees working directly or under contract for the Escambia County Detention Center and/or Escambia County; thereby causing foreseeable harm to Decedent Jerry Preyer's constitutional rights.

128.   Defendants McNesby and Wertz, individually and in their official capacity and/or Escambia County dba Escambia County Detention Center, and PHS and/or ACHS, by and through its policy makers, failed to establish a policy as to the proper use of the M26 Advanced Taser, prior to the June 13, 2006, contrary to established police procedures and accreditation requirements, and failed to establish policies, procedures, customs, and or failed to implement policies procedures and customs related to the use of tasers on mentally ill subjects.

Additionally, these Defendants failed to establish and/or implement or enforce policies, procedures and/or customs related to the recognition of mentally ill patients and provide proper care to those subjects. Such failure constitutes deliberate or reckless indifference to safety; thereby causing foreseeable harm to Decedent Jerry Preyer's constitutional rights.

129. Defendants McNesby and Wertz, individually and in their official capacity and/or Escambia County dba Escambia County Detention Center, by and through its policy makers, permitted, encouraged, tolerated and ratified a pattern and practice of unjustified, unreasonable and illegal use of force by Detention Center officers, in that the Sheriff's Department failed to take adequate corrective action to discipline or prosecute known instances of wrongful and excessive use of force by its officers, thereby causing foreseeable harm to Decedent Jerry Preyer's constitutional rights.

130. Defendants McNesby and Wertz, individually and in their official capacity and/or Escambia County dba Escambia County Detention Center, by and through its policy makers, failed to adequately investigate complaints of previous incidents of wrongful and excessive use of force by Detention Center officers and instead caused its officers to believe such conduct is permissible; thereby causing foreseeable harm to Decedent Jerry Preyer's constitutional rights.

131. Defendants McNesby and Wertz, individually and in their official capacity and/or Escambia County dba Escambia County Detention Center, by and through its policy makers, maintained a system of review of complaints of excessive use of

force by Detention Center officers which has failed to identify the use of
excessive force by those officers and subject those officers, who use excessive
force, to discipline, close supervision or retraining to the extent that it has become
the de facto policy and custom by the Detention Center to tolerate the use of
excessive force by its officers; thereby causing foreseeable harm to Plaintiff's
constitutional rights.

132.    Defendants McNesby and Wertz, individually and in their official capacity and/or
Escambia County dba Escambia County Detention Center, and PHS and/or
ACHS, by and through its policy makers, knew or should have known, of actual
or potential problems with respect to excessive and unreasonable use of force
involving M26 Advanced Taser weapons by its officers on mentally ill subjects
and failed to correct or prevent them, thereby causing foreseeable harm to
Decedent Jerry Preyer's constitutional rights.

133.    The conduct and omissions of Defendants McNesby and Wertz, individually and
in their official capacity and/or Escambia County dba Escambia County Detention
Center, and PHS and/or ACHS, by and through its policy makers, constitutes
unlawful police or detention officer practices.

134.    As a result, Jerry Preyer was denied medical treatment for a serious mental and
medical need and was subjected to unjustified and ineffective tasing that
ultimately contributed to his death.

135.    Plaintiff is entitled to payment of his reasonable attorney's fees pursuant to 42
U.S.C. §§ 1983 and 1988.

WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendants Sheriff Ron McNesby, Captain Barbara Wertz, and Escambia County, PHS and/or ACHS, jointly and severally, for compensatory damages (past and future) as allowed under Florida's wrongful death statute and other applicable state and federal law, in an amount as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's fees for this action in accordance with 42 U.S.C. §1988; for a trial by jury; and for such other and further relief as the court deems just and proper.

## COUNT IV

### NEGLIGENT, GROSSLY NEGLIGENT, RECKLESS AND/OR WANTON FAILURE TO WARN DEFENDANT TASER INTERNATIONAL, INC.

136. Paragraphs one through seventy-seven are hereby realleged and reincorporated as if set forth fully herein.

137. Defendant, Taser International, designed, manufactured, assembled, distributed, marketed and sold its M26 Advanced Taser to law enforcement entities throughout the United States, including Escambia County and the Escambia County Sheriff's Department and the Escambia County Detention Center.

138. Taser International expected and intended the M26 Advanced Tasers to be used by Escambia County Detention Center officers on inmates or pretrial detainees such as persons arrested and/or detained by the Escambia County Sheriff's Department.

139. Taser International knew or should have known the M26 Advanced Taser is

inherently dangerous or has dangerous propensities to the intended targets of the product, such as Decedent Jerry Preyer.

140. Taser International knew or should have known the M26 Advanced Taser is inherently dangerous or has dangerous propensities in that is distributes 50,000 volts or 26 watts of electricity to its target subjects for a period of at least five seconds and, as such, can cause permanent injury or death to its target subjects.

141. Taser International owed a duty of reasonable care to foreseeable subject targets of its Taser weapon, such as Plaintiff, to warn purchasers and users of the inherent dangers and propensities associated with the M26 Advanced Taser; namely the inherent danger and risk of permanent injury and death especially when used on mentally ill patients who are or have been treated with psychotropic medications.

142. Taser International breached its duty of reasonable care owed to Plaintiff by negligently, grossly negligently, recklessly and/or wantonly failing to warn and instruct purchasers and users of the M26 Advanced Taser weapon. Specifically, Taser International failed to warn Escambia County, the Escambia County Sheriff's Department and the Escambia County Detention Center and its officers of the inherent dangers and propensities associated with the M26 Taser weapon.

143. As a direct and proximate result of Taser International's failure to warn and instruct in the use of the M26 Taser on mentally ill patients, Jerry Preyer was subjected to the harmful effects of the use of the M26 Taser with little if any beneficial effectiveness of the device for its intended use. The trauma associated with the use of the M26 Taser contributed to cause Jerry Preyer's excited delirium

and ultimate death.

WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendant

Taser International, Inc., for compensatory damages (past and future) as allowed under

Florida's wrongful death statute and other applicable state and federal law, in an amount

as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's

fees; for a trial by jury; and for such other and further relief as the court deems just and

proper.

**COUNT V**

**NEGLIGENT, GROSS NEGLIGENT, WANTON and/or RECKLESS DESIGN,
MANUFACTURE, ASSEMBLY OR DISTRIBUTION
DEFENDANT TASER INTERNATIONAL**

144.   Paragraphs one through seventy-seven are hereby realleged and reincorporated as
       if set forth fully herein.

145.   Defendant, Taser International, designed, manufactured, assembled, distributed,
       marketed and sold its M26 Advanced Taser to law enforcement entities
       throughout the United States, including Escambia County and the Escambia
       County Sheriff's Department and the Escambia County Detention Center.

146.   Taser International expected and intended the M26 Advanced Tasers to be used
       by Escambia County and officers with the Escambia County Sheriff's Department
       and the Escambia County Detention Center on inmates and pre-trial detainees
       such as Jerry Preyer.

147.   Taser International owed a duty of reasonable care to foreseeable subject targets
       of its Taser weapon, such as Decedent Jerry Preyer, to design, manufacture,

assemble, distribute, market and sell a product which was not unreasonably
dangerous.

148.   Taser International breached its duty of reasonable care owed to Plaintiff in that it
       negligently, grossly negligently, wantonly and/or recklessly designed,
       manufactured, assembled or distributed the M26 Advanced Taser.

149.   Taser International was negligent, grossly negligent, wanton and/or reckless in its
       design, manufacture, assembly or distribution of the M26 Advanced Taser and
       was unreasonably dangerous for its intended purpose of subduing subjects without
       potentially causing death.

150.   As a direct and proximate result of Defendant, Taser International's, negligent,
       gross negligent, reckless and/or wanton design, manufacture, assembly or
       distribution of the M26 Advanced Taser, Decedent Jerry Preyer was subjected to
       the harmful effects of the Taser and suffered excited delirium and ultimate death.

       WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendant

Taser International, Inc., for compensatory damages (past and future) as allowed under

Florida's wrongful death statute and other applicable state and federal law, in an amount

as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's

fees; for a trial by jury; and for such other and further relief as the court deems just and

proper.

## COUNT VI

### STRICT LIABILITY - FAILURE TO WARN
### DEFENDANT TASER INTERNATIONAL

151.   Paragraphs one through seventy-seven are hereby realleged and reincorporated as

if set forth fully herein.

152.   Defendant, Taser International, designed, manufactured, assembled, distributed, marketed and sold its M26 Advanced Taser to law enforcement entities throughout the United States, Escambia County and the Escambia County Sheriff's Department and the Escambia County Detention Center.

153.   Taser International placed the M26 Advanced Taser into the marketplace knowing it would be used by purchasers without inspection for potential defects. Specifically, Taser International expected and intended the M26 Advanced Tasers to be used by Escambia County and the Escambia County Sheriff's Department and the Escambia County Detention Center on inmates and pre-trial detainees such as Jerry Preyer, without inspection for defects.

154.   The M26 Advanced Taser, was defective and unreasonably dangerous to the intended targets of the product, such as Jerry Preyer, and the product was expected to and did reach Escambia County and officers with the Escambia County Sheriff's Department and the Escambia County Detention Center without substantial change affecting that condition.

155.   The M26 Advanced Taser was defective and unreasonably dangerous because the product did not conform to its intended design and failed to perform as safely as the intended design would have performed. More particularly stated, M26 Advanced Tasers and other Advanced Taser product lines cause permanent injury or death when used on target subjects. The products intended design is to function without causing permanent injury or death to its subjects. Taser International's

marketing material, website www.TASER.com, operating manuals and brochures

boast the M26 Advanced Taser and other Advanced Taser product lines as

incapable of causing permanent injury or death. The Advanced Taser Series

Operating Manual states in the very first paragraph under the warning section

states:

156.    As a result of Defendant, Taser International's, defective manufacture of the M26

Advanced Taser and its subsequent failure to warn purchasers and users of the

unreasonably dangerous nature of its product, Jerry Preyer was repeatedly

subjected to the harmful effects of the product and suffered excited delirium and

ultimate death.

WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendant

Taser International, Inc., for compensatory damages (past and future) as allowed under

Florida's wrongful death statute and other applicable state and federal law, in an amount

as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's

fees; for a trial by jury; and for such other and further relief as the court deems just and

proper.

## COUNT VII

### STRICT LIABILITY- DESIGN DEFECT
### DEFENDANT TASER INTERNATIONAL

157.    Paragraphs one through seventy-seven are hereby realleged and reincorporated as

if set forth fully herein.

158.    Defendant, Taser International, designed, manufactured, assembled, distributed,

marketed and sold its M26 Advanced Taser to law enforcement entities

throughout the United States, including Escambia County and the Escambia
County Sheriff's Department and the Escambia County Detention Center.

159.    Taser International placed the M26 Advanced Taser into the marketplace knowing
        it would be used by purchasers without inspection for potential defects.
        Specifically, Taser International expected and intended the M26 Advanced Tasers
        to be used by Escambia County and officers with the Escambia County Sheriff's
        Department and the Escambia County Detention Center on inmates and pre-trial
        detainees such as Jerry Preyer, without inspection for defects.

160.    The M26 Advanced Taser, by reason of a design defect, was unreasonably
        dangerous to the intended targets of the product, such as Plaintiff, and the product
        was expected to and did reach Escambia County and the Escambia County
        Sheriff's Department and the Escambia County Detention Center without
        substantial change affecting that condition.

161.    The M26 Advanced Taser was unreasonably dangerous because of its design as
        the product fails to perform as safely as an ordinary consumer would expect when
        used as intended or in a manner reasonably foreseeable by the manufacturer or the
        risk of danger in the design outweighs the benefits. More particularly stated, M26
        Advanced Tasers and other Advanced Taser product lines cause permanent injury
        or death when used on target subjects, especially mentally ill subjects such as
        Jerry Preyer.  The products intended design is to function without causing
        permanent injury or death to its subjects.

162.    As a direct and proximate result of Defendant, Taser International's, defective

design of the M26 Advanced Taser, Jerry Preyer was repeatedly tazed and
subjected to the harmful effects of the device and suffered excited delirium and
ultimately died.

WHEREFORE, PLAINTIFF prays for the entry of judgment against Defendant
Taser International, Inc., for compensatory damages (past and future) as allowed under
Florida's wrongful death statute and other applicable state and federal law, in an amount
as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's
fees; for a trial by jury; and for such other and further relief as the court deems just and
proper.

## COUNT VIII

## NEGLIGENCE OF PHS, INC., and ACHS, INC.,

163. Paragraphs one through fifty-eight are hereby realleged and reincorporated as if
set forth fully herein.

164. PHS and/or ACHS owed a duty to individuals who might be subjected to
treatment by their employees to provide reasonable training, guidance,
instructions, discipline with regards to the employees provided by these entities to
provide medical and/or nursing care to inmates and pretrial detainees at the
Escambia County Detention Center.

165. PHS and/or ACHS owed a duty to individuals who might be subjected to
treatment by their employees to use reasonable care in the hiring and retention of
employees providing medical and/or nursing care to inmates and pretrial detainees
at the Escambia County Detention Center.

166.   PHS and/or ACHS breached one or more of these duties owed to patients, such as Decedent Jerry Preyer.

167.   As a direct and proximate result, Jerry Preyer was denied medical treatment for a serious medical need and ultimately died as a result.

WHEREFORE, PLAINTIFF prays for the entry of judgment against PHS and/or ACHS for compensatory damages (past and future) as allowed under Florida's wrongful death statute and other applicable state and federal law, in an amount as proved at trial; for an award of punitive damages; for costs, expenses, and attorney's fees; for a trial by jury; and for such other and further relief as the court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues set forth herein which are so triable.

Dated this the **13** day of June, 2008.

**THE COCHRAN FIRM**

**Joseph D. Lane, Attorney for Petitioner**
Florida Bar Number: 0954550
Post Office Box 927
Dothan, Alabama 36302
Telephone number: (334) 793-1555
Facsimile number: (334) 793-8280

**DEFENDANTS MAY BE SERVED AT:**

Prison Health Services, Inc.
c/o CT Corporation System
1200 S. Pine Island Road
Plantation, Florida 33324

Elaine Marie Gregory
11624 Clear Creek Drive
Pensacola, Florida 32514-9705

Armor Correctional Health Services, Inc.
c/o Kenneth Palombo, Registered Agent
4960 SW 72nd Avenue
Suite 400
Miami, Florida 33155

Margaret Grice – LPN
4240 Spanish Trial PL
Pensacola, Florida 32504-8561

Taser International, Inc.
c/o CT Corporation System
2394 E Camelback Road
Phoenix, Arizona 35016

Dr. Piotr Szmurlo
Crestview Consulting, LLC
c/o Edward Arnold, Registered Agent
4516 Hudson Lane
Tampa, Florida 33618

Escambia County Detention Center
Office of Administration
1700 W. Leonard Street
Pensacola, Florida 32501

Shaun Michael White
7405 Sachem Road
Pensacola, Florida 32506-3868

Corporal John Covotta
2644 Tinosa Circle
Pensacola, Florida 32526-1527

Joseph Lamar Brazwell, Jr.
4190 April Road
Pensacola, Florida 32504-7706

Registered Nurse Mary Davis
Post Office Box 95
Jay, Florida 32565-0095

Trudy Burton – RN Nurse
101 Boardwalk Apt 1019
Atlantic City, New Jersey 08401-7928

Corporal Ronald Hankinson
1304 Lakewood Road
Pensacola, Florida 32507-2410

Lieutenant David Phillips
Escambia County Detention Center
1700 W. Leonard Street
Pensacola, Florida 32501

Mr. Lynn Laird
4 Palao Road
Pensacola, Florida 32507-3543

Nurse Cabot White
Escambia County Detention Center
1700 W. Leonard Street
Pensacola, Florida 32501

Sheriff Ron McNesby
Escambia County Sheriff's Office
1700 W. Leonard Street
Pensacola, Florida 32501

Florida Department of Financial Services
Division of Risk Management
Larson Building Room 545
200 East Gaines Street
Tallahassee, Florida 32399

# EXHIBIT A

IN THE CIRCUIT COURT OF ESCAMBIA COUNTY, FLORIDA

In re: J. V. PREYER AS PERSONAL )
REPRESENTATIVE OF ESTATE OF )
JERRY PREYER )
)
v. )
)
ESCAMBIA COUNTY SHERIFF'S )
DEPARTMENT AND OTHERS )
) Civil Action No. 2008 CH 1774
)
)

## PETITION TO THE CLERK OF THE CIRCUIT COURT FOR ESCAMBIA COUNTY COURT  FOR EXTENSION OF STATUTE OF LIMITATIONS PURSUANT TO FLORIDA STATUTE 766.104(2).

Comes now Petitioner,  by and through his undersigned counsel and submits his

petition for an automatic extension of the statute of limitations in the matter described

above and below pursuant to Florida Statute § 766.104(2) (See Attached).  As a basis for

this petition, Petitioner states the following:

1.      This matter concerns potential medical negligence claims against various

Escambia County Sheriff's Department employees and/or agents or subcontractors, the

identity of which has not been fully made at this time, but who are subject to the Medical

Negligence pre-suit requirements under Chapter 766 of the Florida Statutes, and are

subject to the two-year statute of limitations for Medical Negligence actions pursuant to

Florida Statute 95.11, and the 90 day extension of the two year statute of limitation

allowed pursuant to § 766.104(2) of Florida Statutes.

2.      J. V. Preyer, as the personal representative of the Estate of Jerry Preyer (deceased)

and decedent, Jerry Preyer, is and/or was a resident of Escambia County, Florida at all

times material to this matter.  Decedent, Jerry Preyer died on June 13, 2006, while

incarcerated or in the custody of the Escambia County Sheriff's Department, in Escambia County Jail.

3.      The potential medical negligence claims arose out of injuries and damages which Decedent, Jerry Preyer sustained while incarcerated in the Escambia County Jail, in Escambia County, Florida.

6.      This matter involves the potential medical negligence and/or denial of medical treatment to Decedent Jerry Preyer during his incarceration leading up to June 13, 2006.

8.      Pursuant to Florida Statute 95.11, the Statute of Limitations for the above potential medical negligence claims and wrongful death claims would run on June 13, 2008.

9.      The automatic 90-day extension of above stated statute of limitation would place the extended limitation of action on September 11, 2008.

Wherefore, Petitioner, J .V. Preyer hereby submits this Petition for the automatic 90-day extension allowed for this potential medical negligence claim to allow additional time to complete the reasonable pre-suit investigation as set out in Chapter 766 of the Florida Statutes.

Respectfully submitted this the _6_ day of June, 2008.

LAW OFFICES OF COCHRAN, CHERRY, GIVENS & SMITH

By: _____
JOSEPH D. LANE, ESQ.
Attorney for Petitioner

JOSEPH D. LANE, ESQ. (FSBN 0954550)
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
163 West Main Street
P.O. Box 927
Dothan, Alabama 36302
Telephone: (334) 793-1555
Facsimile: (334) 793-8280

Westlaw.

▷

**Effective: July 1, 2004**

West's Florida Statutes Annotated Currentness
  Title XLV. Torts (Chapters 766-774) (Refs & Annos)
    ▤ Chapter 766. Medical Malpractice and Related Matters (Refs & Annos)
      →**766.104. Pleading in medical negligence cases; claim for punitive damages; authorization for release of records for investigation**

(1) No action shall be filed for personal injury or wrongful death arising out of medical negligence, whether in tort or in contract, unless the attorney filing the action has made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint or initial pleading shall contain a certificate of counsel that such reasonable investigation gave rise to a good faith belief that grounds exist for an action against each named defendant. For purposes of this section, good faith may be shown to exist if the claimant or his or her counsel has received a written opinion, which shall not be subject to discovery by an opposing party, of an expert as defined in s. 766.102 that there appears to be evidence of medical negligence. If the court determines that such certificate of counsel was not made in good faith and that no justiciable issue was presented against a health care provider that fully cooperated in providing informal discovery, the court shall award attorney's fees and taxable costs against claimant's counsel, and shall submit the matter to The Florida Bar for disciplinary review of the attorney.

(2) Upon petition to the clerk of the court where the suit will be filed and payment to the clerk of a filing fee, not to exceed $37.50, an automatic 90-day extension of the statute of limitations shall be granted to allow the reasonable investigation required by subsection (1). This period shall be in addition to other tolling periods. No court order is required for the extension to be effective. The provisions of this subsection shall not be deemed to revive a cause of action on which the statute of limitations has run.

(3) For purposes of conducting the investigation required by this section, and notwithstanding any other provision of law to the contrary, subsequent to the death of a person and prior to the administration of such person's estate, copies of all medical reports and records, including bills, films, and other records relating to the care and treatment of such person that are in the possession of a health care practitioner as defined in s. 456.001 shall be made available, upon request, to the spouse, parent, child who has reached majority, guardian pursuant to chapter 744, surrogate or proxy pursuant to chapter 765, or attorney in fact of the deceased pursuant to chapter 709. A health care practitioner complying in good faith with the provisions of this subsection shall not be held liable for civil damages attributable to the disclosure of such records or be subject to any disciplinary action based on such disclosure.

CREDIT(S)

Laws 1985, c. 85-175, § 12; Laws 1986, c. 86-160, § 68; Laws 1986, c. 86-287, § 8; Fla.St.1987, § 768.495; Laws 1995, c. 95-211, § 71. Amended by Laws 1997, c. 97-102, § 1151, eff. July 1, 1997; Laws 2001, c. 2001-155, § 1, eff. June 1, 2001; Laws 2004, c. 2004-265, § 79, eff. July 1, 2004.

HISTORICAL AND STATUTORY NOTES

Amendment Notes:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.